In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

**NO. 09-21-00008-CV**
_____

**IN RE CHASE TALBOT**

**Original Proceeding**
**136th District Court of Jefferson County, Texas**
**Trial Cause No. D-199,314**

## MEMORANDUM OPINION

Chase Talbot seeks mandamus relief from a post-verdict order granting a motion for a mistrial. Talbot challenges the facial validity of the order setting aside a jury verdict and granting a mistrial and argues the record fails to support the trial court's rationale for granting a mistrial. We conditionally grant mandamus relief.[1]

---

[1] The Real Party in Interest, Gabriel Pearce, argues we should dismiss the mandamus petition because Talbot failed to diligently pursue a mandamus remedy. The Texas Rules of Appellate Procedure place no time limit on filing a petition for a writ of mandamus, but we may deny a mandamus petition under the equitable doctrine of laches if the relator fails to diligently pursue mandamus relief. *See Rivercenter Assocs. v. Rivera*, 858 S.W.2d 366, 367 (Tex. 1993) (orig. proceeding); *In re Allstate Prop. & Cas. Ins. Co.*, No 09-20-00031-CV, 2020 WL 1879659, at *1 (Tex. App.—Beaumont Apr. 16, 2020, orig. proceeding) (mem. op.). Generally, establishing laches requires showing an unreasonable delay and a good faith and

Underlying Facts and Procedural History

The Real Party in Interest, Gabriel Pearce, sued Talbot for personal injuries sustained in a motor vehicle accident that occurred in December of 2015. Prior to trial, on June 11, 2019, Pearce filed a motion to exclude the testimony of Talbot's expert, Dr. Anne Hayman, a board certified radiologist and a neuroradiologist. Dr. Hayman has over thirty years of experience interpreting images from patients with brain and spinal trauma, and she is currently a Professor Emeritus at MD Anderson. Prior to trial, Pearce obtained the oral deposition of Dr. Hayman. Pearce argued in his motion to exclude that Dr. Hayman's opinions and the conclusions in her report[2]

---

detrimental change in position because of the delay. *In re Laibe Corp.*, 307 S.W.3d 314, 318 (Tex. 2010) (orig. proceeding). In this case, Talbot provided a reasonable explanation for the delay in seeking mandamus relief, and Pearce has not shown that the delay resulted in a detrimental change in his position. We conclude that the record in this case does not warrant the application of the doctrine of laches to the requested mandamus relief.

[2] Dr. Hayman's written report described her professional background, education, and work history, identified the images she reviewed, and stated her opinions, which in part were as follows:

> I have reviewed the radiology reports of the chart radiologists and the images of Mr. Pearce's cervical and lumbar spine. They confirm the presence of degenerative spinal changes which are routinely seen in an active 31 year old m[a]n. There is no swelling, bleeding or fracture to indicate spinal trauma.
>
> If there were spinal root compressions, each of them would produce a specific, immediate pattern of sensory and motor signs which could be traced back to a compressed sensory and/or motor roots. Without a matching neurological exam there is no evidence of traumatic injury.
>
> I have rendered these opinions with a reasonable degree of medical certainty. I have [] relied on my training and experience in

2

and in her deposition testimony were inadmissible. Pearce objected to Dr. Hayman's testimony to the extent "it goes beyond the opinions" in her report. Pearce also objected to Dr. Hayman's opinions and conclusions and argued she should be excluded as an expert witness because her opinion and conclusions were not relevant and not based on reliable foundations and the probative value of her testimony was outweighed by its prejudicial effect. Providing forty-eight specific examples from Dr. Hayman's deposition testimony, Pearce argued such testimony was deficient, she lacked knowledge of matters discussed in her written report, her opinions and conclusions were not based on an independent understanding of what happened, and her opinions were based on inadequate data, were not adequately explained, and exposed too great an analytical gap between her methodology and her opinions. Talbot argued that Pearce failed to make even a prima facie challenge to Dr. Hayman's qualifications, and that plaintiff failed to sufficiently challenge the reliability of her opinions pertaining to Pearce or her reading of his MRIs. Talbot suggested that, considering the timing of the motion, he would tender Dr. Hayman's testimony to the court outside the presence of the jury and the trial court could make its ruling at that time and assess her qualifications and the reliability of her opinions. Talbot further noted Dr. Hayman's opinions were based on her experience and

---

formulating this report. I reserve the right to alter my opinions should additional information become available. Should you require further assistance please feel free to contact me.

3

training in interpreting MRIs and imaging studies, and on her review of the actual images taken on Pearce, that Pearce's complaints about Dr. Hayman were conclusory and failed to establish a basis for exclusion of her testimony, and that her findings and opinions about Pearce having degenerative changes were not unusual and were consistent with the many notations made by the radiologist who read the MRI at the hospital. The trial court deferred ruling on the motion to exclude Dr. Hayman. The case went to trial before a jury.

Jury Trial

On June 17, 2019, the trial court called the matter for a jury trial, and on June 18, 2019, Plaintiff and Defendant rested their cases. During the trial, the defendant did not contest that his negligence caused the accident, and the Court granted the Plaintiff a Directed Verdict that Defendant's negligence proximately caused the occurrence, and that Plaintiff was not contributorily negligent. Plaintiff verbally objected at the close of the defense expert's testimony and moved for a mistrial based upon the alleged improper and prejudicial testimony from the defense expert. The Court took the matter under advisement, and the case was submitted to the jury. The Jury returned its verdict on June 20, 2019. The sole issue submitted to the jury concerned damages.

Question No. 1 and the jury's response thereto was as follows:

4

What sum of money, if paid now in cash, would fairly and reasonably compensate GABRIEL PEARCE for his injuries, if any, that resulted from the occurrence in question?

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

Do not include any amount for any condition existing before the occurrence in question, except to the extent, if any, that such other condition was aggravated by any injuries that resulted from the occurrence in question.

Answer separately, in dollars and cents, for damages, if any.

a.     Medical expenses paid or incurred in the past
Answer: $33,200
b.     Medical care and expenses that, in reasonable probability, GABRIEL PEARCE will sustain in the future.
Answer: $20,000
c.     Physical pain sustained in the past
Answer: $0
d.     Physical pain that, in reasonable probability, GABRIEL PEARCE will sustain in the future.
Answer: $0
e.     Mental anguish sustained in the past
Answer: $0
f.     Mental anguish that, in reasonable probability, GABRIEL PEARCE will sustain in the future.
Answer: $0
g.     Physical impairment sustained in the past
Answer: $0
h.     Physical impairment that, in reasonable probability, GABRIEL PEARCE will sustain in the future.
Answer: $0

5

During the trial, the defense argued that Pearce's injuries and spinal problems were preexisting conditions from prior accidents and injuries, and that he had degenerative changes in his spine that were already present before this accident. Medical records that were admitted during the trial showed that several years before the accident at issue in this suit Pearce had prior treatment for head, neck, and back pain. In April of 2008, Pearce went to the hospital complaining of head pain, neck pain, mid back pain and low back pain following a motor vehicle accident where he was run off the road and his vehicle hit a tree or a pole. Other medical records showed that in January of 2010, he was involved in another motor vehicle collision and he was treated at the emergency room for neck pain and vertebral tenderness. The medical records from 2010 indicated he complained of neck pain and low back pain at the hospital. In January of 2011, Pearce went to the emergency room again, complaining that he was hurting from the middle of his back upward, and that his arms and neck were hurting. In February of 2012, Pearce was seen at the emergency room complaining of mid and low back pain, and the records indicated he had been walking on the road and he was hit by a car.

At trial, Pearce testified that he had neck and lower back pain and that he had received medical treatment in 2015 for his condition. Pearce's complaints of pain are referenced in copies of his medical records from medical providers of treatment he received after the 2015 accident, and those records were submitted to the jury.

Dr. Romero's video deposition was played for the jury. Dr. Romero testified that he found that Pearce had cervical and lumbar spine symptoms consistent with stenosis at C5-6, C6-7 and L5-S1 and that Pearce's symptoms and stenosis are consistent with the MRI findings, and Dr. Romero testified that Pearce needed a two-level surgery of the cervical spine, requiring removal of two discs and a fusion and insertion of a plate and screws. The estimated recovery time would be nine to twelve months. On cross examination, Dr. Romero agreed that disc space narrowing like that seen on the images of Pearce's cervical and lumbar spine can be a degenerative finding and the mild desiccation he observed could be consistent with degenerative processes or the accident. Dr. Romero did not review any pre-accident medical records and Pearce had told Romero he had no significant back or neck problems before the accident.

When Pearce testified at trial, he also agreed that during his deposition, he had been asked whether he had ever suffered any injury to his neck before the December 5, 2015 accident, and he agreed that he said "No." Pearce also agreed that during his deposition, he denied ever having been to a doctor complaining of any sort of neck pain before the December 5, 2015 accident. Pearce agreed that he only told his treating doctors in this case about the 2015 accident with Talbot, and he did not tell them about the other accidents or about the prior problems of neck and arm pain.

Prior to allowing the defense to call Dr. Hayman to testify, the trial court allowed the plaintiff's attorney to conduct a voir dire of Dr. Hayman outside the presence of the jury. Dr. Hayman stated that in preparing her report she reviewed a cervical MRI without contrast and a lumbar MRI without contrast prepared approximately one month post-accident and the radiology reports for those images. She agreed she had no patient history or emergency room records. She noted that the first radiologist reported degenerative diseases that included osteophytes, disc bulges and herniations, and mild decreased signal indicative of early dehydration and desiccation but found no fractures, dislocations, epidural hematoma, or neoplastic process. Dr. Hayman added that in her deposition she stated that the degenerative changes visible on Pearce's MRIs can be seen on anyone of that age. According to Dr. Hayman, factors supporting a conclusion that the films showed degenerative disc disease include the lack of blood loss or blood collection in the surrounding soft tissues, and no fractures or malalignment. Dr. Hayman indicated that Pearce's complaint of pain indicates possible musculoskeletal injury, but he had no injury that caused a fracture or dislocation, or any indication in the imaging associated with bad or permanent cervical trauma. In her report, Dr. Hayman stated that she saw no traumatic changes but there were mild degenerative changes present. The trial court warned the defendant that any opinion Dr. Hayman offered must be based on specific information that pertained to Pearce and more than mere theoretical speculation. The

trial court took under advisement Pearce's objections to Dr. Hayman's opinion testimony regarding degenerative disc disease, which had been disclosed in her 2018 report, and Pearce's complaint that Talbot had failed to respond to certain discovery requests in July 2017.

The trial court stated on the record:

THE COURT: Well, certainly to the extent that the witness is going to testify about general matters relating to medicine or radiology or things within the medical field, certainly the witness is qualified to be able to do that.

[Plaintiff's Counsel]: Could I ask the Court about some specific opinions? For instance, on one hand she's saying there's mild degenerative changes but then she says there's no -- there's no traumatic changes as if they're mutually exclusive. If you can't see trauma, then it must be degeneration. And I submit to the Court that's not even the job of a radiologist to identify trauma because they -- that's what doctors do with clinical examinations and history. And, so, if she's going to testify about degenerative changes, that's different than saying no trauma.

THE COURT: Well, my second part of what I was about to address was to the extent that this expert was going to opine any opinions as to the plaintiff or the plaintiff's medical condition or status, I don't know if it's sufficient to be able to render an opinion to say merely that it is possible. I think there's got to be an opinion sufficient to say that what is probable and supported by the evidence and based upon reasonable medical probability as to what the condition would be or what the cause of the condition is and then those opinions would need to be supported by the appropriate factual matters relating specifically to this plaintiff.

…

[Plaintiff's Counsel]: I think I understand the Court's ruling, your Honor. We won't require anything further from a voir dire perspective.

9

THE COURT: All right. What I'll do is any opinion that is given as to the plaintiff, again, needs to be based on specific information that pertains to this plaintiff and needs to be an opinion that was more than mere theoretical speculation. Would need to be one that is -- that can be properly articulated within a degree of medical probability. To have a person come in and say it theoretically could be this is not going to be sufficient. It needs to be something that is able to diagnose this within sufficient medical probability that said this is the condition and this is why and would not necessarily constitute mere conjecture.

So, I'll allow you some leeway, Counselor, to be able to try and present that testimony. However, understand I'm basing these statements upon the answers in the voir dire examination that I've had. A lot of the responses to the question about these conditions, you know, related to it's possible or it could be. And, again, I think for the opinion to be reliable it needs to have some matter of specificity or degree of probability to be of assistance to the jury.

The other thing I'm going to instruct the witness as to any other physicians that may have treated this patient, certainly any statement as to that witness' reputation or -- within the medical community, I don't know that it would be appropriate. Certainly if the -- if there's an opinion that the physician has rendered that the expert disagrees with, they'll be able to say that. But, certainly, I don't find it to be appropriate to say that this physician has a reputation in the community to overread charts or to underread charts or to make whatever type of mistakes. I think that would be an improper impeachment of that physician and also possibly constitute -- probe into the realm of character evidence that, again, would not be relevant as to the physician. So, those matters we do not need to discuss in front of the jury.

With that being said, is there anything else that we need to address with this witness?

[Plaintiff's Counsel]: No, your Honor.

[Defendant's Counsel]: No.

THE COURT: Let's bring in the jury.

10

Dr. Hayman then testified before the jury. She described her professional, clinical, and academic experience for the jury. She explained that she had held academic or clinical positions with Harvard Medical School, the National Institutes of Health, Baylor College of Medicine, Ben Taub Hospital, the University of Texas, and her current position is professor emeritus at MD Anderson Hospital.

In this case, she was hired by the defendant to review and read the images and provide her opinions. She explained that when she reads cervical and lumbar MRI "films" each consists of over a hundred images that are captured on the computer and it allows her to then see all angles of the spine. Dr. Hayman explained that on two occasions she read approximately 150 cervical spine images and 100 or 150 lumbar spine images from Pearce's 2016 MRIs. She prepared a report summarizing her findings where she compared the findings from the reading of an MRI done by radiologist, Dr. Farolan, with her opinions. Dr. Hayman stated that radiologists do not typically examine patients or review their other medical records and she did not review Pearce's. She did not examine or speak with Pearce, but she indicated that typically a radiologist never actually sees or examines the patient.

She agreed that she based her opinions on reasonable medical probability. According to Dr. Hayman, Dr. Farolan had noted that Pearce's cervical MRI revealed straightening of the lordotic curvature. While that condition could possibly indicate a muscle spasm, it is normal in ten to fifteen percent of people and she would

11

not expect to see muscle spasms one month post-accident. Dr. Farolan's report also noted osteophytes anteriorly at C5-6 and C7, which she testified indicated degenerative changes, a slow process due to age causing neither stenosis nor pinched nerves. Dr. Farolan noted no fracture, dislocation, epidural hematoma, or neoplastic process, which Dr. Hayman testified meant he did not see any trauma. According to Dr. Hayman, all of Dr. Farolan's findings described what she calls "degenerative" changes. Dr. Hayman testified that the presence of degenerative changes in Pearce's spine at thirty-one years of age was likely attributable to activity and, as indicated by the presence of changes to the bone throughout the spine, due to the aging process rather than trauma.

According to Dr. Hayman, throughout the lumbar spine Dr. Farolan found degenerative changes that he referred to as disc herniation. She disagreed with Dr. Farolan's finding of stenosis. Dr. Hayman found only mild degeneration and she found an annular fissure rather than a tear resulting from trauma. Dr. Farolan did not use the word "aging" in his report, but according to Dr. Hayman, what Dr. Farolan described as osteophytes and hypertrophic changes of the facet joints are degenerative changes. Dr. Farolan reported moderate to marked left inferior neural foraminal stenosis and slight right inferior foraminal stenosis. According to Dr. Hayman, the presence on both sides of the spine indicated a degenerative rather than a traumatic condition. She did not detect any traumatic injury in the images of

12

Pearce's spine. Dr. Hayman noted that trauma can cause wear and tear that in reasonable medical probability will appear in an MRI taken years later but not as soon as one month post-accident.

Under cross-examination, Dr. Hayman admitted that Dr. Farolan was the treating radiologist and had a doctor-patient relationship with Pearce while she had been paid $1,300 to testify for the defense, and she agreed she owed no ethical, moral, or legal duties to Pearce. She agreed she had not seen Pearce's records from the emergency room or from his treating physician. Dr. Hayman noted that her experience in this case had caused her to possibly reconsider agreeing to review x-rays without clinical records. She admitted that in her deposition she had agreed with plaintiff's counsel that it was unfair to make opinions without knowing the patient's clinical information. Although she prefers to clinically correlate the findings with the patient's symptoms, she did not do so in this case. Her opinion was a radiological determination that the x-rays showed degeneration and not trauma.

Dr. Hayman stated that Pearce's imaging did not reveal a condition for which Pearce would need surgery, but she expressed no opinion about whether his condition requires surgery, and she was unaware of the recommendations of Pearce's treating physicians. Dr. Hayman disagreed with the portion of the chiropractor's records that stated, "These findings correlate to the recent auto accident and are new and non-preexisting due to the lack of bone spur and acute bright signals within the

13

disc material that's been ruptured." She admitted that she had not been given any records from which she could know what limitations Pearce experienced from the accident. Because she did not have the additional records, Dr. Hayman also could not offer an opinion about any of his previous conditions.

Dr. Farolan's report stated that Pearce had a disc herniation at L5-S1, but Dr. Hayman said that condition can appear and be asymptomatic in normal people. She agreed that she could not prove a person would not be more susceptible to injury because that would require proving a negative. Dr. Hayman testified that Pearce's x-rays suggest he should have a weak thumb on the left. She admitted that she was testifying without having the deposition or testimony of Pearce's treating physician. She was not saying that Pearce did not have neck pain after the accident or that any of his medical expenses were not reasonable or necessary. Her opinion was that the radiology does not support a traumatic injury. She agreed that as a radiologist, she does not treat nerve compression. When pressed on cross about whether she had any reason to dispute or doubt Dr. Romero's opinion that Pearce is in chronic pain, Dr. Hayman answered that sitting in the courtroom Pearce did not look like he was in pain. She noted that Pearce was not hyperventilating, sweating, or rising to walk around. She agreed that she had no information about how he had been feeling in 2013 through 2015.

After Talbot rested, Pearce moved for a mistrial on the ground that Dr. Hayman's personal attacks against plaintiff's counsel and her non-responsive answers and her refusal to make direct answers prejudiced the plaintiff. The trial court took the motion under advisement. Talbot's attorney argued that Pearce waived any error by failing to request instructions to disregard. The trial court did not rule on the motion for mistrial and the case was submitted to the jury. The jury awarded past medical expenses of $33,200 and future medical expenses of $20,000, but awarded zero for past or future physical pain, past or future mental anguish, or past or future physical impairment.

Post-Trial Request for Ruling on Mistrial

On September 11, 2019, Pearce filed a written motion for a ruling on his oral motion for a mistrial. The trial court heard Pearce's motion for mistrial several months after the jury returned its verdict.[3] Pearce's counsel argued that the derogatory comments Dr. Hayman made to Pearce's counsel during her testimony caused the jury to dislike the lawyer and disbelieve that Pearce was hurt. Talbot's counsel suggested that Dr. Hayman had been annoyed by a failure of counsel to provide all of Pearce's records before her deposition, which counsel repeatedly

---

[3] The Jury Verdict was delivered on June 18, 2019. Pearce filed his written motion asking the trial court to rule on his verbal motion for a mistrial on September 11, 2019. On October 28, 2019, the trial court then held a hearing on the request for a mistrial.

15

pointed out in her deposition and at trial, and Dr. Hayman became frustrated when Pearce's counsel repeatedly returned to the same subject before the jury.

Analysis

"Mandamus is the proper vehicle to review the granting of a mistrial." *In re Hightower*, 580 S.W.3d 248, 253 (Tex. App.—Houston [14th Dist.] 2019, orig. proceeding [mand. denied]). The post-verdict order at issue here operates as the functional equivalent of an order granting a motion for a new trial. *See id.* An order granting a new trial must state a legally appropriate reason that is sufficiently specific to demonstrate that the trial court derived the articulated reason from the particular facts and circumstances of the case at hand. *In re Bent*, 487 S.W.3d 170, 173 (Tex. 2016) (orig. proceeding). If the order is facially sufficient, the reviewing court conducts a merits review of the bases for the order and grants mandamus relief if the record fails to support rationale expressed in the order. *Id.*

Normally, mistrial is a remedy available only in extreme circumstances involving highly prejudicial and incurable errors. *In re R.V.*, No. 07-19-00326-CV, 2020 WL 897241, at *2 (Tex. App.—Amarillo Feb. 21, 2020, pet. denied) (mem. op.). Failure to request the trial court to instruct the jury to disregard the inadmissible testimony results in waiver of the alleged error where the instruction would have cured the error. *State Bar of Tex. v. Evans*, 774 S.W.2d 656, 658 n.6 (Tex. 1989). A mistrial is not an appropriate remedy for the introduction of inadmissible evidence

before the jury if a limiting instruction to disregard the inadmissible evidence would cure the harm. *Owens-Corning Fiberglass Corp. v. Malone*, 916 S.W.2d 551, 563 (Tex. App.—Houston [1st Dist.] 1996), *aff'd*, 972 S.W.2d 35 (Tex. 1998).

In the trial court's nine-page order granting Pearce's motion for a mistrial, the trial court does identify specific instances where the trial court concluded that Dr. Hayman's trial testimony "exceed[ed] the scope of her disclosed opinions," and was "improper and/or unfairly prejudicial to" Pearce. Assuming without deciding that the trial court's order is facially sufficient, after conducting a merits review of the bases for the order, we find the record fails to support the rationale and conclusions expressed in the order.

For example, in the first segment of testimony identified in the order, Pearce's counsel objected that Dr. Hayman had made a derogatory comment about another doctor, and Dr. Hayman responded that she had been referring to counsel when she stated that if the word "degenerative" appeared in Dr. Farolan's report, "he" would find it and she would have to "give in." The trial court stated, "Let's not have any other, again, statements that aren't responses specifically to the questions. Let's move forward." The trial court did not rule on Pearce's objection during the trial, and Pearce did not object or request an instruction to disregard Dr. Hayman's comment to counsel.

In the second segment of testimony identified in the order, when Pearce's counsel showed Dr. Hayman the chiropractor's report and asked her what limitations Pearce suffered from the collision, Dr. Hayman remarked that she had not been given any records and she wished he would stop asking the same question. Pearce failed to object to Dr. Hayman's comment at trial, and he did not request an instruction to disregard.

In the third segment of testimony identified in the order, Dr. Hayman and Pearce's counsel sparred over whether there was evidence that a person is or is not more susceptible to injury and Dr. Hayman answered at some point,

> A: Well, there we go again. There we go again. If it's not ever been reported, you want to say that it's true because there's no data on it but there is data. There's an absence of data which means it isn't true. But you've got me back again with that how do I prove a negative. You can't prove a negative. I can't prove you're not cheating on your wife. You can't prove you're not cheating on your wife."

Counsel did not object to the answer but continued:

> Q: Ma'am, I'm sorry. That is an offensive comment to me.

> A: I'm so sorry.

> Q: It's personal. It's too personal. I don't appreciate it.

> A: Thank you for taking my apology like a gentleman.

At no time did counsel for Pearce object to the answers or statements in this exchange as nonresponsive nor did he request an instruction to disregard.

In the fourth segment of testimony cited in the trial court's order, the trial court references testimony where Pearce's counsel asked Dr. Hayman, "Dr. Romero has the opinion that Mr. Pearce is in chronic pain. Do you have any reason to dispute that?" Dr. Hayman replied, "Well, just looking at him, he doesn't look like he's in pain to me." Pearce's attorney did not object to the answer. Instead, Pearce's counsel asked, "Beyond that, as a doctor." Dr. Hayman replied, "As a doctor, I'm looking at him. He isn't hyperventilating. He's not sweating. He's not uncomfortable. He hasn't moved from his position in his chair. He hasn't had to stand up and walk around for back pain problems. I mean, looking at him from across the room, I wouldn't guess that I could tell him from anybody else." Counsel asked, "So you would be saying nobody in the room is in any kind of pain?" Dr. Hayman replied, "Well, I'm in pain." Pearce made no contemporaneous objection to any of this testimony, nor did he request an instruction to disregard.

Fifth, the trial court listed a segment of the testimony after Pearce's attorney mentioned that Dr. Hayman was being paid a thousand dollars per hour to testify, to which Dr. Hayman replied, "It's not worth it." Pearce made no contemporaneous objection to this testimony, nor did he request an instruction to disregard.

Sixth, the trial court noted that after asking Dr. Hayman on re-direct examination if Pearce's counsel went beyond the scope of Dr. Hayman's report during her three-hour deposition, Talbot's counsel asked, "Well, did you feel like it

19

was fair to you to ask you questions that went beyond the scope of your report and beyond the scope of the information you were provided?" Dr. Hayman replied, "Right. I was only hired to be a radiologist, and I was being beaten and browbeaten over that." Pearce objected, "I object. That's not -- nobody's ever complained about that." Pearce's counsel added "That's not appropriate." The trial court did not rule on the objection, but admonished Dr. Hayman in front of the jury to refrain from making snide remarks, to maintain a professional composure, and to try to limit her responses to very specific answers to questions. Dr. Hayman explained to the court that in her deposition she had stated that it was unpleasant, and she felt unfairly treated when Pearce's counsel went beyond that scope of her report and asked her to provide opinions about matters on which she had not been provided information. She agreed that it was fair for her as a radiologist to review MRI images and provide her radiological opinions about what those images show.

In its order granting Pearce's motion for a mistrial, the trial court identified nine instances when the trial court instructed Dr. Hayman to limit her answers to the specific question asked. In the hearing on Pearce's motion to exclude Dr. Hayman's testimony, the trial court found Dr. Hayman to be qualified to testify about general matters relating to medicine or radiology but noted an expert's opinion must be based on reasonable medical probability and supported by appropriate factual matters and it would not be sufficient to render an opinion that is merely possible.

The trial court did not, at that time, admonish Dr. Hayman to only answer the question she was asked. As the hearing on the admissibility of Dr. Hayman's testimony concluded, the trial court indicated counsel would be allowed leeway but indicated the witness should refrain from mentioning another physician's reputation in the community. Again, the trial court did not admonish Dr. Hayward concerning confining her answer to the question she was asked. In the course of Dr. Hayman's testimony before the jury, the trial court instructed the witness to give straightforward answers to specific questions seven times, but in only *one of the nine* instances mentioned in the order granting Pearce's motion for a mistrial did the trial court sustain an objection from Pearce that Dr. Hayman's answer had been nonresponsive to the question asked, and in that instance Pearce did not request an instruction from the court telling the jury to disregard the answer.

In the order granting the mistrial, the trial court found that Dr. Hayman ignored the trial court's instructions and admonitions, but during the trial, the trial court never instructed the jury to disregard any of Dr. Hayman's nonresponsive answers or testimony. In the order granting the motion for a mistrial, the trial court made a specific finding that Dr. Hayman's improper conduct is attributable entirely to Dr. Hayman alone, not to Talbot or his attorney. The trial court also stated in his order

> The Court finds that Hayman's undisclosed, nonresponsive and/or improper testimony referenced herein unfairly prejudiced the Plaintiff,

21

including by the Jury's award of zero damages, on various elements, including for past physical pain, past mental anguish and past physical impairment even after the Jury awarded some of Plaintiff's past and future medical expenses, which was necessarily based upon a finding that Plaintiff was injured in the collision after Defendant admitted to negligence in causing the collision.

The Court finds that due to Hayman's improper, prejudicial[,] and inflammatory testimony referenced herein, the Jury did not correctly apply the Plaintiff's burden of proof of a preponderance of the evidence in reaching a verdict of zero damages for past physical pain, past mental anguish and past physical impairment, in light of the presence of uncontroverted testimony to the contrary.

In this case, Pearce failed to object and request an instruction to disregard each time Dr. Hayman provided a non-responsive answer that the trial court described in its order granting the motion for a mistrial. The trial court then notes that the non-responsive answers "embroil[ed] Plaintiff's counsel into various confrontations of a personal natur[e]." The well-settled law concerning motions for mistrial allows for a mistrial only where an instruction to disregard would have been ineffective. *See Malone*, 916 S.W.2d at 563. A trial court abuses its discretion if it grants a new trial to a party based upon error that has been waived. *See In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d 746, 760-61 (Tex. 2013); *In re United Servs. Auto. Ass'n*, 446 S.W.3d 162, 175 (Tex. App.—Houston [1st Dist.] 2014, orig. proceeding), *mand. denied sub nom*, *In re Bent*, 487 S.W.3d 170 (Tex. 2016).

Here, the trial court made findings in the order granting a mistrial that the cumulative effect of Dr. Hayman's "undisclosed, nonresponsive and/or improper

22

testimony referenced herein unfairly prejudiced the Plaintiff[]" and due to such testimony the jury "did not correctly apply the Plaintiff's burden of proof of a preponderance of the evidence in reaching a verdict of zero damages for past physical pain, past mental anguish and past physical impairment, in light of the presence of uncontroverted testimony to the contrary." The trial court identified the zero-damage awards for non-economic damages as proof that Dr. Hayman's non-responsive testimony prevented a proper verdict from being rendered.

We conclude that the trial court improperly applied the applicable law. Juries have great discretion in deciding whether the evidence supports an element of damages, and the mere fact of injury does not necessarily entitle the plaintiff to damages for pain, mental anguish, or physical impairment. *In re Tex. Farm Bureau Mut. Ins. Co.*, No. 01-19-00742-CV, 2020 WL 573249, at **3-4 (Tex. App—Houston [1st Dist.] Feb. 6, 2020, orig. proceeding) (mem. op.). Further, the mere fact that the jury did not award non-economic damages after it has already awarded medical damages also cannot be a valid basis for granting a new trial. *In re Orren*, 533 S.W.3d 926, 930 (Tex. App.—Tyler 2017, orig. proceeding).

"The amount of evidence necessary to support the jury's verdict is far less than that necessary to warrant disregarding the jury's verdict." *In re Zimmer, Inc.*, 451 S.W.3d 893, 906 (Tex. App.—Dallas 2014, orig. proceeding). In this case, the mandamus record provides a valid basis on which the jury could have based its

verdict. While we agree that there is some evidence from Pearce, his medical records, and his treating physicians showing Pearce complained of pain and further that such evidence might have supported a jury finding for such non-economic damages, the jury in this case awarded no such damages. The jury could have disbelieved Pearce's testimony or the other evidence and could have found it was not credible, or perhaps could have believed that his complaints were related to his preexisting conditions and other accidents. *See In re Tex. Farm Bureau Mut. Ins. Co.*, 2020 WL 573249, at *3 ("Appellate courts have upheld zero-damage awards for physical pain, even when the jury found the plaintiff was entitled to damages for past medical expenses, when the jury heard conflicting evidence regarding the cause of the injury or alternative explanations for the plaintiff's pain."). Further, although Pearce's testifying expert, Dr. Neil Romero, recommended surgery for treatment for disc herniations that he believed were caused by the motor vehicle collision with Talbot, he also agreed that his opinions were based on Pearce's denial that he had any previous history of significant symptoms. And Pearce agreed that he had not informed Dr. Romero and his doctors that he had been in other accidents before. The jury saw medical records that Pearce had been in several previous accidents, and that he had presented in an emergency room on several occasions before 2015 complaining of neck and back pain. Pearce admitted he failed to disclose his prior injuries in his deposition.

The record in this case simply does not support the trial court's finding that Dr. Hayman's testimony deprived the plaintiff of a fair trial, nor does it support the trial court's conclusion that Dr. Hayman's non-responsive answers caused the jury to "improperly apply the plaintiff's burden of proof." The trial court improperly applied the "zero damages" rule which has been rejected by this court. *See Waltrip v. Bilbon Corp.*, 38 S.W.3d 873, 880 n.2 (Tex. App—Beaumont 2001, pet. denied); *see also In re Allstate Prop. & Cas. Ins. Co.*, 09-20-00031-CV, 2020 WL 1879659, at *4 (Tex. App.—Beaumont Apr. 16, 2020, orig. proceeding) (mem. op.) (grant of new trial not supported by record where jury found zero damages for future pain and suffering). We conditionally grant Talbot's petition for a writ of mandamus. A writ shall issue only in the event the trial court fails to vacate its order of January 21, 2020.

PETITION CONDITIONALLY GRANTED.

PER CURIAM

Submitted on February 3, 2021
Opinion Delivered May 20, 2021

Before Kreger, Horton and Johnson, JJ.